UNITED STATES of America, Appellee,

v.

Daniel V. HOGG, Appellant.

UNITED STATES of America, Appellee,

v.

John B. ROBINSON, Appellant.

UNITED STATES of America, Appellee,

v.

Timothy Leon DROSE, Appellant.

Nos. 80–5149 to 80–5151.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 9, 1981.

Decided Feb. 16, 1982.

concealing a fugitive, in violation of 18 U.S.C. §§ 371 and 1071[1] contending that the evidence was insufficient to support their several convictions and that the district court's instruction concerning proof of their knowledge of the existence of a federal warrant created an unconstitutional presumption against them. We reverse as to the defendant Robinson for insufficiency of the evidence, and as to the other defendants because of constitutional infirmity in the court's jury instruction on proof of knowledge.[2]

Coming B. Gibbs, Jr., Charleston, S.C. (Gibbs, Gaillard & Rowell, Charleston, S.C., on brief); John F. Hardaway, Columbia, S.C. (Donald Barkowitz, Arthur G. Howe, Uricchio, Howe & Krell, Charleston, S.C., David P. McCann, Columbia, S.C., on brief), for appellants.

Lionel S. Lofton, Asst. U. S. Atty., Charleston, S.C. (Henry Dargan McMaster, U. S. Atty., Columbia, S.C., on brief), for appellee.

Before RUSSELL, Circuit Judge, FIELD, Senior Circuit Judge, and PHILLIPS, Circuit Judge.

JAMES DICKSON PHILLIPS, Circuit Judge:

The defendants have appealed their respective jury convictions of conspiracy to harbor or conceal, and of harboring or

I

On May 2, 1975, Donald Edward Miles escaped from a Georgia jail where he was incarcerated pending imposition of sentence for violating the Georgia Drug Abuse Control Act. Some time later he moved to the Charleston, South Carolina area. In late 1977 or early 1978, Miles renewed a friendship with the defendant Timothy Drose, whom he had known in Charleston in the early 1970's. When Miles reappeared, he was using the name Donald Williams.

At this time, Drose was living with, and paying rent to, the defendant John Robinson. Robinson owned a large, 4-bedroom house in which friends often dropped by and spent a few nights if they needed a place to stay. In February or March 1978, Drose took Miles/Williams to the house and introduced him to Robinson. Robinson and Miles/Williams became friends, and Miles/Williams often spent the night as Drose's guest at Robinson's house. There is

1. Count 1 of the indictment charged Timothy Leon Drose, John B. Robinson, William Honeycutt, and Daniel V. Hogg of conspiracy to harbor and conceal Donald Edward Miles under 18 U.S.C. § 371. Count 2 charged the same defendants with harboring and concealing Miles under 18 U.S.C. § 1071 and 2. Honeycutt became ill and the case against him was continued. The jury found Drose and Robinson guilty on both counts, and found Hogg guilty on Count 1 but not guilty on Count 2. We will hereinafter refer to Drose, Robinson, and Hogg collectively as the "defendants," with the understanding that "defendants" does not include Honeycutt.

2. Because we reverse on this ground, we need not reach the defendants' further assignments of error that the trial judge should have excluded certain testimony because it revealed a confidential spousal communication and concerned a fraud conspiracy but not a harboring conspiracy; that the trial judge should have severed the trial of Hogg after Drose's counsel revealed on cross-examination of Hogg's wife that Hogg had beaten her; and that the trial judge erred in refusing to warn the jury that it should view the testimony of Lisa Hogg, an unindicted coconspirator, with caution.

no testimony that Robinson ever knew that "Williams" was an alias for "Miles." In May 1978, Robinson bought a black Cadillac and sold it to Miles, because Miles had insufficient credit to buy a car on his own. Robinson retained title and insurance on the car in his own name. He had made similar deals with other friends in the past.

Miles also met the defendants Daniel V. Hogg and William Honeycutt in early 1978. Several times during 1978 he stayed at Hogg's apartment for one or two weeks at a time. In general, Miles seemed to drift around, staying with friends or in hotels in the Charleston area. He also made several trips out of state.

Sometime around June 1, 1978, Miles told Drose, Hogg, Lisa Hogg (Hogg's wife), and Honeycutt that he had escaped from prison. This conversation occurred in Robinson's house. The indictment charged that Robinson was present, but there was no evidence introduced that Robinson was present or ever learned of this conversation, nor more generally that he ever knew Miles had escaped from prison.[3]

Lisa Hogg testified that Hogg, Honeycutt and Miles often discussed—from "the very beginning"—their fears that the FBI would recapture Miles. In fact, the FBI did not issue a warrant for Miles' arrest until June 21, 1978.[4] The defendants continued, however, to befriend Miles after June 21, 1978. At one point, Robinson and Drose rented an apartment on the Isle of Palms in order to have a place to stay near a nightclub they ran on the island. Miles moved his belongings from Robinson's house to the apartment, and Miles and Drose lived there for several weeks. In another incident emphasized at trial, Drose obtained a pool pass for Miles for the Shadowmoss subdivision where Robinson lived—putting the name Don Williamson on the pass. In general, the defendants remained friends with Miles and were often with him. However, Miles maintained a very open lifestyle, frequenting bars, restaurants, and nightclubs, and going shopping by himself and with others. He certainly was not hiding in the ordinary sense.

The testimony also revealed some more damaging conduct by the defendants, however. On December 11, 1978, Lt. Parsley of the Charleston Police Department met Drose and asked Drose to help him locate two fugitive friends of Drose, Miles and a Mr. Patent.[5] Lt. Parsley specifically told Drose that "Miles is an escapee from Georgia, wanted by the F.B.I.". Drose answered that he did not know where Miles was, but thought he had been arrested in Florida.

In February 1979, Miles wrecked the black Cadillac in a hit-and-run accident in Georgia. Hogg drove the car back to Charleston, and Hogg, Honeycutt, and Drose decided to burn the car and collect insurance on it, rather than have the car repaired. Lisa Hogg testified that they did this because they were afraid that the police or FBI might otherwise trace the car. Drose and Hogg actually burned the car. Honeycutt then bought a gold Cadillac for Miles, keeping the title in his name.

Miles called Robinson and told him that the black Cadillac had been stolen in Charlotte, North Carolina, and that Robinson should report the theft because the insurance was in Robinson's name. After a few weeks, Robinson falsely told the police and insurance agency (and later told the same story to the FBI) that the Cadillac had been

---

**3.** Lisa Hogg did testify that about 2 or 3 weeks before this conversation, she and Hogg, Drose and his girlfriend, Robinson and his wife, and Miles met at a room Miles had on Kiawah Island for Mother's Day. The women stayed around the pool while the men went inside. Obviously, she could say nothing about what Miles and the defendants discussed then.

**4.** The indictment alleged that the conspiracy to harbor began in February 1978, but the district court rightly struck the allegations of crimes or overt acts occurring before June 21, 1978.

**5.** Drose told Lt. Parsley he did not know Mr. Patent, and there is no evidence in the record suggesting otherwise.

stolen from him while parked outside the nightclub he owned.

On April 16, 1979, an agent from the Department of Alcohol, Tobacco, and Firearms spotted Miles driving his Cadillac to a grocery store. The agent followed Miles to Drose's apartment, and then called the FBI and local police. The officers staked out the apartment, and after Miles drove away they arrested him. None of the defendants acted to prevent the arrest in any way.

## II

The defendants contend that the government did not establish sufficient evidence for a jury to have found beyond a reasonable doubt that they knew a federal warrant existed for Miles' arrest or that they harbored or concealed Miles. We agree that there was insufficient evidence that Robinson knew a federal warrant existed. Such knowledge is an essential element of the federal crime of harboring, 18 U.S.C. § 1071, and is equally an essential element of the crime of conspiring to harbor under 18 U.S.C. § 371. *United States v. Bekowies*, 432 F.2d 8, 14 (9th Cir. 1970). We find, however, sufficient evidence, if credited by a jury, that Drose and Hogg knew a warrant existed, that Drose harbored Miles within the meaning of 18 U.S.C. § 1071, and that Drose and Hogg conspired to do so within the meaning of 18 U.S.C. § 371.

The evidence, considered in the light most favorable to the government, *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), showed that Drose knew Miles was using an assumed name, and that Drose failed to introduce him by his real name. Most critically, Drose was specifically told by the local police in December 1978 that Miles was wanted by the FBI. There was direct evidence that Drose and Hogg often talked (both before and after December 1978) about their fears that the FBI would find Miles, and they won-

dered what they could do to thwart the FBI. Hogg drove the wrecked Cadillac back from Georgia, perhaps so Miles would not be seen in the car. Finally, Lisa Hogg testified that Drose and Hogg burned the black Cadillac in order to prevent the FBI from tracing the car. This evidence, if credited by the jury, was sufficient to find beyond a reasonable doubt that Drose and Hogg knew the FBI had a warrant for Miles' arrest and that they concealed Miles from the FBI.

The evidence against Robinson, however, is far weaker. As indicated in our summary of the evidence, there was no testimony that Robinson ever realized that the person he knew as Don Williams was indeed Don Miles, nor that he knew Miles was a state prison escapee, nor that he knew the FBI had a warrant out for Miles' arrest. The government, at oral argument, could point to no specific circumstantial evidence that Robinson knew a federal warrant existed.

Any inference of knowledge on Robinson's part must come from his alleged acts of harboring. We do not think the proof of harboring here sufficient for that purpose, even if it might suffice under some circumstances, a question we need not decide.

Robinson did let Miles stay at his house, but this began well before the federal warrant issued. Robinson rented an apartment on the Isle of Palms at which Miles stayed, but the legitimate business reason for this—needing a place to stay near his nightclub—is uncontradicted in the record, and Miles was very open while living there.

The only questionable action by Robinson upon which the jury could arguably infer knowledge is when he told the police and his insurance agency that the black Cadillac titled in his name had been stolen from him, when he in fact thought it had been stolen from Miles in Charlotte.[6] This may well be insurance fraud, and perhaps, reading it

6. Miles told Robinson by phone that the car had been stolen from Miles in Charlotte. In fact, Miles wrecked the car in Georgia, Hogg

most generously in the government's favor, as an attempt to thwart authorities from finding Miles. This latter inference seems weak, for by reporting the car to authorities Robinson called attention to the car and was certainly inviting an investigation. In any event, we find that this insurance fraud episode is insufficient to establish both that Robinson harbored Miles and that Robinson knew a federal warrant existed for Miles' arrest.

The only other possible basis of an inference that Robinson knew of a warrant would be his association with Miles, Honeycutt, and the other defendants, who, as we have held the jury permissibly found, did know of the warrant. Robinson indeed lived with Drose for several months, although Drose moved out soon after the federal warrant was issued in June 1978. Robinson met Hogg and Honeycutt only once or twice, and the alleged co-conspirators were never all with Miles at the same time.[7] We think that no jury could reasonably find beyond a reasonable doubt from this pattern of intermittent association with persons possessing knowledge that Robinson acquired the same knowledge.

The government urges us to rely on *United States v. Giampa*, 290 F.2d 83 (2d Cir. 1961), and *United States v. Kutas*, 542 F.2d 527 (9th Cir. 1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 790 (1977), for support in inferring knowledge of a federal warrant from acts of harboring. However, in those cases the harboring acts were far more substantial—and thus more clearly indicated knowledge—than the acts performed by Robinson. In *Giampa*, the defendant signed his own name in leasing the fugitive's apartment and had a telephone installed in his own name. Further, he brought groceries to the apartment so the fugitive need not appear in public. Finally, and perhaps most importantly for inferring knowledge, he barred federal agents from entering the apartment while yelling "run, Nick, it's the Feds." The court found it overwhelming that the defendant knew his friend was a fugitive from justice. In *Kutas*, after the fugitive escaped from federal prison, the defendant and others drove him to a remote area of Williamette National Forest and set up camp in an underground bunker. The court found the circumstantial evidence that the defendant knew the fugitive was an escapee sufficient to go to the jury.[8] In both these cases,[9] then, the acts of harboring far more clearly established knowledge of the existence of a warrant than do the acts of Robinson.

### III

The defendants also challenge the district court's instructions to the jury on the evidence needed to prove knowledge. To obtain a conviction under 18 U.S.C. §§ 1071 or 371, the government must prove beyond a reasonable doubt, as one of the essential elements of the offense, that the defendants actually knew that a federal warrant existed for the arrest of the fugitive they are charged with harboring. In instructing the jury on the proof necessary to infer knowledge of a federal warrant, the district court charged:

> defendants knew a *federal* warrant, rather than merely any warrant, existed.

drove it back to Charleston, and Hogg and Drose burned it near Charleston. There is no evidence that Robinson knew of this.

7. On Mother's Day, 1978, Hogg, Drose, Robinson and Miles did meet together, but Honeycutt was not present. This Mother's Day meeting was the only instance in the record where all the defendants met with Miles. There is no evidence of what was discussed at this meeting.

8. It is important that the defendant in *Kutas* knew the fugitive had escaped from *federal* prison. This makes it far more likely that the

9. The government also points to *United States v. Bissonette*, 586 F.2d 73 (8th Cir. 1978), and *United States v. Eaglin*, 571 F.2d 1069 (9th Cir. 1977), *cert. denied*, 435 U.S. 906, 98 S.Ct. 1453, 55 L.Ed.2d 497 (1978). In *Bissonette* the defendant actually asked the FBI whether it had a warrant for the fugitive's arrest, and was told that indeed the FBI did. *Eaglin* involved the same conspiracy as *Kutas*.

The third element of the offense requires proof that the Defendant had notice or knowledge of the fact that a warrant or process had been issued for the fugitive. Notice is knowledge of facts which would naturally lead an honest and prudent person to make inquiry and does not necessarily mean knowledge of all the facts. When a person has sufficient information to lead him to a fact, he is deemed under the law to have knowledge of it. No person can intentionally avoid knowledge by closing his eyes to facts which should prompt him to investigate and deliberate avoidance of such knowledge is the equivalent of actual knowledge. Notice is established if the accused is aware of a high probability of the existence of the fact in question, unless he actually believes it does not exist. None of a Defendant's conduct prior to the date when he first learned about a warrant or process for the arrest of a certain individual can constitute an offense under 18 U.S.Code 1071; although it might throw light on the Defendant's conduct after he gains such knowledge.

The defendants contend that under the rationale employed by the Supreme Court in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), a reasonable jury could have interpreted this instruction as reducing the government's burden to prove the requisite knowledge on defendant's part to less than a showing beyond a reasonable doubt. We agree and hold that the challenged instruction was unconstitutional under *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

In *Sandstrom*, the defendant was charged with purposeful or knowing homicide. The defendant confessed killing the victim, so the sole issue was his intent. The judge instructed the jury that "the law presumes that a person intends the ordinary consequences of his voluntary acts." The Supreme Court found that the jury could have interpreted the charge as requiring the jury to infer intent if it found that certain voluntary acts existed. Following *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), and *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), the Court then held that such a conclusive presumption violated the *Winship* reasonable doubt standard. The Court found alternatively that the jury may have thought that the charge required the defendant to produce more than some evidence to rebut a finding of intent, once certain voluntary acts were found. Following *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), the Court found that such a persuasion-shifting instruction violated the *Winship* standard.

We think that teaching applies to the instruction here challenged. A reasonable jury may well have believed from this instruction that it must infer that the defendants had actual knowledge if it found they had sufficient information to lead them to knowledge of a federal warrant. According to the instruction, the law *deems* actual knowledge in such a situation. Additionally, a reasonable jury may have thought that it must infer actual knowledge if it determined that the defendants deliberately avoided knowledge of a warrant. The overall import of this instruction, as was that of the *Sandstrom* instruction, was to lower the government's burden to prove this essential element beyond a reasonable doubt.

The instruction is not saved by the trial court's further statement that knowledge is established by the defendants' belief that a warrant probably exists, unless the defendant actually believes the warrant does not exist. This instruction correctly states that the defendant must have actual knowledge. But a reasonable jury could well interpret it also to mean that, once the government shows that the defendants knew a warrant probably existed, the defendants must introduce more than some evidence that they had no actual knowledge to avoid a finding

against them on this element.[10]  *Sandstrom* equally prohibits such a persuasion-shifting instruction.

### IV

The conviction of the defendant Robinson is reversed and the action as to him remanded for entry of a judgment of acquittal.   The convictions of the defendants Hogg and Drose respectively are set aside and the action as to each of them remanded for new trial.

REVERSED; REMANDED.

DONALD RUSSELL, Circuit Judge, dissenting:

I dissent only from the reversal of the conviction of John B. Robinson.   I think that the evidence, taken in the light most favorable to the government was sufficient to support the jury's verdict of guilty as to John B. Robinson and that the judgment of conviction as to him should be sustained.

---

**10.**  The *Sandstrom* Court accepted, for purposes of argument, the state's characterization of the amount of proof the defendant must show to avoid a beyond-a-reasonable-doubt finding as being "some" evidence.   442 U.S. at 516 n.5, 99 S.Ct. at 2455 n.5.   We need not, and do not, determine whether this characterization of the obverse of a reasonable-doubt standard is appropriate.   The jury here was not given any guidance on the amount of proof the defendants had to show in order to rebut the initial inference.