UNITED STATES of America,
Plaintiff-Appellee,

v.

Patricia GROS, Defendant-Appellant.

No. 85–3376.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 5, 1986.

Decided July 24, 1987.

Christopher D. Stanley, Cleveland, Ohio, for defendant-appellant.

J. Matthew Cain, Asst. U.S. Atty., Cleveland, Ohio, Wm. J. Edwards (argued), for plaintiff-appellee.

Before ENGEL and NORRIS, Circuit Judges, and COHN,* District Judge.

ENGEL, Circuit Judge.

Defendant Patricia Gros, common law wife of FBI Ten Most Wanted Fugitive Raymond Levasseur, was arrested November 4, 1984. After her arrest, a search was made of her residence and she was later indicted on six counts, four of which were presented at trial. Count I charged violation of 18 U.S.C. § 1071, harboring a fugitive, Levasseur, who was wanted for two bank robberies. Count II alleged the knowing possession of an identification document of the United States, a social security card in the name of Charlotte Louise Mills, knowing that this document was stolen or produced without the authority of the United States, in violation of 18 U.S.C. § 1028(a)(6) and (c)(1). Count IV charged a violation of the same statute for the possession of six documents that appeared to be blank social security cards. Finally Count V alleged that Gros possessed five or more identification documents or false identification documents in the form of an abstract of birth records,

birth certificates, and drivers' licenses, all in violation of 18 U.S.C. § 1028(a)(3) and (c)(3). Following a jury verdict of guilty on all four counts, Gros was sentenced to three years on the harboring charge, one year each on Counts II and IV, to be served concurrently with the sentence on Count I, and two years for Count V, to be served consecutively to the sentences imposed on Counts I, II and IV, for a total committed sentence of five years.

In her appeal Gros raises eleven claims of error, only two of which we conclude require extended discussion. Both relate to the document possession charges in Counts II, IV and V. We affirm.

I.

The FBI's interest in Raymond Levasseur arose from outstanding warrants for his arrest for the armed robbery of the Northeast Bank of Westbrook, in Portland, Maine on October 4, 1975, and for the December 12, 1975 robbery of the Bank of Maine in Augusta. Approximately six weeks after the first warrant was issued for Raymond Levasseur, someone applied for a social security card in the name of Judy Hymes, and on the same day a Connecticut driver's license was issued to Patricia Gros in the name of Judy Hymes. The real Judy Hymes was an infant, who had in fact died many years before, in 1951.

Thereafter Levasseur and defendant had, in the latter's words, gone "underground" until their apprehension in 1984. In the years between 1976 and 1982, Patricia Gros and her common law husband and children traveled throughout New England, using various names, among them Horning, Ouellette, and Hymes. There was no evidence that she used the name of Gros during these years before her arrest. In 1982 the couple moved to the Cleveland area under the name of Peterson. Thomas Manning, an accomplice in the robberies, was then observed at the defendant's home. After the arrest of Gros, Levasseur and others, a search warrant was obtained for the resi-

---

* Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

dences at 1903 State Route 225, Deerfield, Ohio, and at 4248 West 22nd in Cleveland, and also for the residence of Thomas and Carol Manning in Jefferson, Ohio. During the execution of the search warrant at Deerfield, many items were seized including some which were introduced into evidence at trial, and particularly to prove Counts II, IV and V of the indictment. These included drivers' licenses, birth certificates, social security cards, and many other items of identification, in blank. Also seized in Patricia's bedroom was an original FBI "wanted" flyer showing the photographs of herself, Raymond Levasseur and the other accomplices, which was relevant to prove the harboring count. Blank social security cards and other identification were found in the same suitcase with the "wanted" flyer, and Special Agents Dennis Archey and James Lyons both testified that the government's Exhibit 14, the blank social security cards, appeared to be legitimate social security cards to them. Further, Patricia Szarnicki, an employee of the Ohio Bureau of Motor Vehicles, testified that a social security card is necessary to obtain an Ohio driver's license. James Grimes, an agent with the Inspector General of the United States Department of Health and Human Services, also testified that, to the untrained eye, the cards would probably appear to be legitimate social security cards.

## II.

To understand defendant's complaints that the possession counts were invalid, and the instructions concerning them inadequate, it is necessary to repair to the language of the statute itself, which we have set forth in the margin.[1] Count IV of the indictment states:

> On or about the 4th day of November, 1984, in the Northern District of Ohio, Eastern Division, PATRICIA GROS aka PATRICIA LEVASSEUR did knowingly possess six (6) identification documents

1. **§ 1028. Fraud and related activity in connection with identification documents**

   (a) Whoever, in a circumstance described in subsection (c) of this section—

   (1) knowingly and without lawful authority produces an identification document or a false identification document;

   (2) knowingly transfers an identification document or a false identification document knowing that such document was stolen or produced without lawful authority;

   (3) knowingly possesses with intent to use unlawfully or transfer unlawfully five or more identification documents (other than those issued lawfully for the use of the possessor) or false identification documents;

   (4) knowingly possesses an identification document (other than one issued lawfully for the use of the possessor) or a false identification document, with the intent such document be used to defraud the United States; or

   (5) knowingly produces, transfers, or possesses a document-making implement with the intent such document-making implement will be used in the production of a false identification document or another document-making implement which will be so used;

   (6) possesses an identification document that is or appears to be an identification document of the United States which is stolen or produced without authority knowing that such document was stolen or produced without authority; or attempts to do so, shall be punished as provided in subsection (b) of this section.

   \* \* \* \* \* \*

   (c) The circumstance referred to in subsection (a) of this section is that—

   (1) the identification document or false identification document is or appears to be issued by or under the authority of the United States or the document-making implement is designed or suited for making such an identification document or false identification document;

   (2) the offense is an offense under subsection (a)(4) of this section; or

   (3) the production, transfer, or possession prohibited by this section is in or affects interstate or foreign commerce, or the identification document, false identification document, or document-making implement is transported in the mail in the course of the production, transfer, or possession prohibited by this section.

   (d) As used in this section—

   (1) the term "identification document" means a document made or issued by or under the authority of the United States Government, a State, political subdivision of a State, a foreign government, political subdivision of a foreign government, an international governmental or an international quasi-governmental organization which, when completed with information concerning a particular individual, is of a type intended or commonly accepted for the purpose of identification of individuals. . . .

that appeared to be identification documents of the United States, to wit: Social Security cards bearing no name, nor Social Security account numbers, knowing that said documents were stolen or produced without the authority of the United States, in violation of Title 18, U.S.C. § 1028(a)(6) and (c)(1).

For accuracy, we quote directly the theory of appellant's defense as set forth in her brief:

The defendant believes that the elements to be proven under this section of 18 USC 1028 [i.e., 1028(a)(6) and (c)(1) ] are as follows:

(1) The documents possessed are identification documents as defined in 18 USC 1028(d)(1);

(2) The documents appeared to be identification documents;

(3) The possessor of said documents knew that the documents were stolen or were produced without the authority of the United States.

■ That one of the elements Congress intended for the government to prove under 18 USC 1028(a)(6) was that the documents possessed were identification documents as defined in 18 USC 1028 (d)(1) is apparent from a close examination of 18 USC 1028. In the other five sections of 18 USC 1028, namely 1028(a)(1), 1028(a)(2), 1028(a)(3), 1028(a)(4) and 1028 (a)(5) Congress specifically included the alternative of "identification document" or "false identification document" as an element to be proven. Only in 1028(a)(6) did Congress specifically omit the alternative of "false identification document". Accordingly, it is clear that under 1028(a)(6) one of the elements which Congress intended for the prosecution to prove beyond a reasonable doubt is that the documents possessed are "identification documents" as defined in 18 USC [§ 1028] (d)(1).

■ In the instant case, the record is clear that the six blank cards are not identification documents as defined in 18 USC [§ 1028] (d)(1). See Testimony of James Grimes T 385–387. Nor do the documents appear to be identification documents (T 244, 255) since they are blank on the back and have a liberty bell on them that has

never appeared on social security cards (T 387–389). Accordingly, the government did not sustain its burden as to these elements and this Court must vacate the defendant's conviction for Count Four.

Essentially, because the cards were blank and contained a liberty bell which had never appeared on social security cards, the defendant claims that such documents were not in fact social security cards produced by the government, and that perforce, such a card could not be an "identification document" as defined in subsection 1028(d)(1).

The government's response is perhaps overly simple: "[u]nder a Rule 29 analysis the question is only whether the government's evidence was *sufficient* to present a question of fact for the jury to decide." Because the blank cards were reasonable facsimiles of social security cards, the government argues, whether in the language of the statute they "appeared to be" identification documents was properly left to the jury.

A reading of the several subsections of section 1028(a) indicates a congressional desire to prohibit the unlawful use of identification documents in a wide variety of circumstances. Such a reading indicates that subsection (6) was added to criminalize the act of simple possession where one or more of the other elements of subsections (1) through (5) was missing. This subsection was added at conference, see Conference Report No. 97–975 dated December 17, 1982, 97th Cong., 2d Sess., but without much elaboration as to its meaning. The language employed is somewhat awkward, and the defendant has emphasized that the use of the term "identification document" twice in subsection (6) appears to be inconsistent with the use of the term in subsection 1028(d)(1). On this basis defendant would require, as an additional element, proof of authenticity which was not and could not be present in Count IV because of the acknowledged fact that the documents in question were not authentic.

■ Simply stated, we conclude that Congress could not have intended the first use of the term "identification document"

in subsection (6) to be identical to the second phraseology of subsection (6): "identification document of the United States." A simple deletion of the first term "identification" would have made clear the meaning of subsection (6). Any such ambiguity would likewise be resolved by reference in subsection (6) to an identification document "of the United States which is ... produced without authority knowing that such document was ... produced without authority." In other words, a document produced without authority could not be an "identification document 'made or issued by or under the authority of the United States government ...'" as that term is used in subsection (d), and we do not believe that any person charged with a violation could have reasonably been misled to believe that the subsection countenanced the type of fake document alleged here. Thus, we also reject Gros' objection to the following instructions the court gave as to Count IV:

In order to establish that the defendant is guilty of a violation of Title 18, United States Code Section 1028(a)(6) and (c)(1) as charged in the fourth count of the indictment, the government must prove beyond a reasonable doubt that:

1. The defendant knowingly possessed six identification documents that appeared to be identification documents of the United States, to wit, Social Security cards bearing no names or Social Security account numbers.

2. The defendant had knowledge that the above-described documents were stolen or produced without the authority of the United States.

The definitions previously given with respect to count II apply equally to count IV.

Gros contends that the jury should have been instructed that the blank "Social Security cards" were "identification documents" within the meaning of § 1028(d)(1) as a separate element of the § 1028(a)(6) violation, because Count IV contains three elements rather than two. We believe that the trial judge's jury instructions were adequate, and, because, as indicated, the language and history of the statute do not require that the documents subject to subsection (a)(6) be authentic, defendant's

charge, by contrast, would have confused the jury by setting up an irreconcilable conflict between subsections (a)(6) and (d)(1) that we believe does not exist. By insisting upon three elements, one of which was inconsistent with another, defendant was faithful neither to the common sense language of the statute, nor to the court's obligation to clearly instruct the jury regarding the applicable law.

### III.

Equally stressed by defendant is her claim that the trial judge for all intents and purposes deprived the defendant of her right to require the government to prove beyond a reasonable doubt each element of the possession offense. She asserts that the illustrative instructions given by the district court virtually directed the jury to find as a matter of law that the social security cards and other documents in question must be construed by the jury to be "commonly accepted" identification documents as that term is used throughout the statute.

The False Identification Crime Control Act of 1982 was intended to provide penalties for certain false identification related crimes. The statute recognized a distinction between those documents which governments intentionally produced for the express purpose of identifying the holder, such as birth certificates, alien registration cards, and passports, and those which were designed primarily for some other purpose. The statute also recognized that there was a classification of documents which, if not primarily intended for identification purposes, were still "commonly accepted for the purpose of identification of individuals," 18 U.S.C. § 1028(d)(1). As to those documents that are the subject of Counts II, IV, and V, defendant claims that the trial judge's instruction had the impermissible effect of directing a verdict of guilty as to that particular element of the crime.

In this respect, the defendant has argued that the trial judge conclusively instructed the jury on the facts of the case and, in doing so, impermissibly invaded the province of the jury. Defendant insists that the trial judge must always instruct the jury

that judicially noticed facts may be disregarded so as to preserve the jury's traditional prerogative to ignore even uncontroverted facts in reaching a verdict, citing *United States v. Jones,* 580 F.2d 219, 223 (6th Cir.1978). *See also United States v. Ragsdale,* 438 F.2d 21 (5th Cir.1971). The error, defendant asserts, was particularly egregious where, as here, a social security card which was the subject of Count II specifically provided on its face that it was not to be used for identification purposes and was thus not intended by the government to be so used.

The government on the other hand argues that social security cards are in fact commonly accepted as identification documents and that there was no error in the instruction, relying upon *United States v. Quinteros,* 769 F.2d 968 (4th Cir.1985). To a similar challenge raised in that appeal, the Fourth Circuit observed:

> It is true, of course, that providing identification to the holder is not one of the primary purposes of Social Security cards. In fact, the Operation Procedure Manual of the Social Security Administration states that the Social Security card is not to be used for the purpose of identification. Nevertheless, the Social Security card is commonly accepted as an identification card. An expert for the Social Security Administration testified that the Administration frequently issues Social Security cards to elderly people for the purpose of providing identification for cashing checks. She further testified that the legend "Not for Identification Purposes" was dropped from the card in 1972 because individuals nevertheless were using the cards for identification purposes. We think this reflects the common understanding that Social Security cards are identification documents. The fact that an illegal market valued Social Security cards for identification purposes further supports our conclusion that such cards are commonly accepted for identification within the meaning of section 1028(d)(1).

*Id.* at 970.

■ A careful reading of the instructions as a whole given to the jury convinces us that if there was any error, it was not of constitutional proportions and did not deprive the defendant of her right to have the jury determine whether each element of the defense had been established as a matter of law. Significantly, the challenged jury instruction appears only once, and then as an illustrative comment in connection with the court's instruction on Count V. Because of its importance, we quote the trial court's instruction on Count V in full:

"Count V of the indictment alleges as follows:

"That on or about the 4th day of November, 1948 [sic] in the Northern District of Ohio, Eastern Division, Patricia Gros aka Patricia Levasseur did knowingly possess in and affecting interstate commerce with the intent to use unlawfully five or more identification documents or false identification documents, to wit, (1) an abstract of birth records issued by the City of Lowell, Massachusetts on October 7, 1976 in the name of Judy N. Hymes; (2) a Certification of record of birth issued by the City of Lowell, Massachusetts on November 8, 1976 in the name of Judy Nancy Hymes; (3) A State of Connecticut Hymes [sic]; (3) a State of Connecticut Motor Vehicle Operator's License issued in [sic] approximately November 10, 1976 in the name of Judy N. Hymes; (4) a State of Connecticut Motor Vehicle Operator's License issued on approximately April 13, 1977 in the name of Judy N. Hymes; (5) a State of Connecticut Motor Vehicle Operator's License issued on approximately March 13, 1979 in the name of Judy N. Hymes; (6) a Certificate of Live Birth issued by the State of Maine, Department of Health and Welfare, issued on approximately October 27, 1945 in the name of Paula Marie Horning; (7) a Certificate of Birth issued by the Connecticut State Department of Health on approximately June 21, 1963 in the name of Charlotte Louise Mills; (8) a Certificate of Birth issued by the Connecticut State Department of Health on September 12, 1978 in the name of Joyce Ann Tonkowicz; all in violation of Title 18, United States Code, Section 1028(a)(3) and (c)(3).

"Title 18, United States Code § 1028(a)(3) and (c)(3) provides as follows:

"(a) Whoever, in a circumstance described in subsection (c) of this section—

"(3) knowingly possesses with intent to use unlawfully or transfer unlawfully five or more identification documents other than those issued lawfully for the use of possessor [sic] or false identification documents; ...

"(c) The circumstance referred in [sic] subsection (a) of this section is that—

"(3) The production, transfer, or possession prohibited by this section is in or affects interstate or foreign commerce, or the identification document, false identification document, or document-making implement is transported in the mail in the course of the production, transfer, or possession prohibited by this section shall be guilty of the offense of the laws of the United States—I think that should read 'shall be guilty of the offense against the laws of the United States.'

"In considering count V, and in determining whether any of the alleged possessions of the particular documents in question constitutes a violation of federal law, you must first determine that the particular document falls within the definition of an identification document as that term as [sic] been explained to you.

"If you determine any or all of the documents in question and which are the subject of count V are, in fact, identification documents as the government alleges, you must then determine whether that particular identification document meets either one of the following requirements:

"(1) Is or does the document appear to be issued by or under the authority of the United States?; or

"(2) If the identification document does not appear to be issued by or under the authority of the United States, is the alleged production, transfer or possession of the particular document in interstate commerce or does it affect interstate commerce?

"In other words, if you find that the identification document is or appears to be issued by or under the authority of the United States, it is the type of identification document that is covered by the acts prohibited by Section 1028. However, if the identification document does not appear to be such a United States Government issued document, but instead an identification document purporting to be made or issued by a State or any political subdivision of a State, you must find that the production prohibited by Section 1028 is in or affects interstate commerce.

"Commonly Accepted Defined: In order for any such governmental type document to constitute an identification document covered by the criminal acts prohibited by Section 1028, the particular document in question must be of the type intended or commonly accepted for the purpose of identification of individuals.

"Whether a document is 'intended' to identify an individual is determinable by looking at the purpose for which it is issued by the governmental agency purporting to issue the document. Examples of such documents issued for the purpose of identifying an individual would be passports, alien registration cards, and governmental employee identification cards.

"It is the Government's position that all of the documents that are the subject matter of count V of all documents that are the subject matter of count V [sic] are of the type 'commonly accepted' for the purpose of identifying an individual. The term 'commonly accepted' is intended to cover identification documents which may not have been intended to serve solely as a form of identification when originally issued, but have, nevertheless, become such a document in common usage. Examples of such identification documents would be birth certificates, driver's licenses, Social Security cards, etc. However, 'commonly accepted' does not require that the document be accepted under any and all circumstances, but rather that it is accepted in situations where a document of that nature would reasonably be accepted for identification purposes.

"Is In or Affects Interstate Commerce defined: The term 'is in or affects interstate commerce' simply means and requires that the prohibited possession has no [sic] more than a minimal nexus with interstate commerce. Such a minimal interstate com-

merce nexus means that the documents [sic] production, transfer or possession has had to have some effect upon interstate commerce. The prohibited act need not be contemporaneous with the movement in or effect upon interstate commerce. Nor is it necesary [sic] that the purpose of the prohibit acts to be—Excuse me, I am going to read that sentence again. Nor is it necessary for the of [sic] the prohibited act be to use or affect interstate commerce. For instance, a showing that a false identification document that was produced or transferred by or was in the possession of a defendant traveled at some time interstate [sic] commerce would be sufficient. Moreover, a production or transfer of an identification document which is intended to be distributed or used in interstate commerce would meet this minimal nexus requirement.

"Furthermore, this minimal nexus requirement is satisfied if you find beyond a reasonable doubt from the evidence in the case the defendant had an intent to do acts which, if complete, would have affected interstate commerce. In this regard, the government [sic] is not required to prove that the defendant was aware of the future effect upon interstate commerce, but only that the full extent of the scheme, if successful, would have had such results.

"In other words, the government is not required to prove the defendant had knowledge of the interstate commerce nexus.

"Interstate Commerce defined: The term 'interstate commerce' means commerce between one state and another state. This includes all means of transportation and communication between one state and another state,

"Essential Elements of Offense—Count V: Once again, if you find that five or more of the documents that form the basis of Count V are, in fact, identification documents and further meets one of the jurisdictional requirements I previously discussed with you, you must further find that the government has proven the following additional essential elements of the offense beyond a reasonable doubt before you can fidn [sic] the defendant guilty of Count V:

"First: That the defendant possessed five or more false identification documents or identification documents; and

"Second: That the defendant did so knowingly and with the intent to use the document unlawfully.

"Unlawfully defined: Unlawfully means contrary to law. So to do an act "unlawfully" means to do willfully something which is contrary to law. An act is done willfully if done voluntarily and intentionally, and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.

"The government is obliged to establish each of the elements of the crime charged in Count V of the indictment by proof beyond a reasonable doubt. The law never imposes upon the criminal prosecution the burden of calling any witness or the burden of introducing any evidence."

Therefore, Count V of the indictment charged Patricia Gros with possession to use unlawfully five or more identification documents in violation of 18 U.S.C. § 1028(a)(3). The documents described in Count V were eight in number and included five birth certificates and three drivers' licenses. The instruction complained of—the use of social security cards, drivers' licenses, and birth certificates as examples of "commonly accepted" documents—unquestionably was intended by the trial judge to relate only to Count V. This instruction, if erroneous, was certainly harmless beyond a reasonable doubt. First, this instruction involved an entirely different subsection of the statute from that involved in Counts II and IV, and in our view the jury could only have concluded that these instructions were intended to relate to Count V. Second, the reference to social security cards did not introduce error because no social security cards were in issue under this count. Even more persuasive, a natural reading of the language of these instructions in context indicates that the trial court was conveying to the jury the prosecution's theory, a theory which included its claim that the three described kinds of documents were illustra-

tive of the type commonly accepted as identification documents.

The government was fully entitled, under the proofs, to argue that social security cards were "commonly accepted" within the meaning of the statute. The government introduced proof that the false cards appeared to be social security cards to the common eye and also that social security cards were required as identification to obtain drivers' licenses in Ohio, where the defendants were apprehended. Because the court appears to have prudently separated the instructions with respect to each count, we believe that the likelihood under these circumstances that the jury would have concluded that the court had directed it to apply the instruction for Count V to the facts and charges in Counts II and IV to be altogether too tenuous to warrant reversal on this account. That the written instructions were delivered to the jury for its use during deliberations reinforces our conclusion. Thus the jurors were not obliged to rely solely upon their own memories, but could see for themselves the organization of the instructions, count by count. In such circumstances we conclude that the application of *Rose v. Clark* —— U.S. ——, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), is particularly appropriate, and that considering the activity of Patricia Gros and her family, we say with confidence that upon the whole record any error was harmless beyond a reasonable doubt. The instructions given with respect to each offense were otherwise proper, and defendant was represented by careful and aggressive counsel who took great care not only to take advantage of every potential defense, but to preserve objections fully upon the record.

## IV.

We have carefully considered all of the remaining claims of error asserted by defendant. While not frivolous, they do not require extended discussion.

■ Gros contests her conviction of the harboring charge in Count I because she says there was no proof that she had notice and knowledge of the two warrants which were circulated for Levasseur. This is fully rebutted by the evidentiary record showing constant flight, the closeness of the relationship between defendant and Levasseur, and her possession of the FBI Most Wanted List seized at her home. Her claim that there must be direct evidence of actual knowledge of the warrants, relying upon *United States v. Hogg*, 670 F.2d 1358 (4th Cir.1982), is misplaced. That the government may prove such knowledge by inference rather than by direct evidence is well established. In fact, *Hogg* has been cited in support of the government's contrary position, *see United States v. Silva*, 745 F.2d 840, 848 (4th Cir.1984); *United States v. Udey*, 748 F.2d 1231 (8th Cir. 1984); *United States v. Giampa*, 290 F.2d 83, 84 (2d Cir.1961). While it is true that the government must prove "actual knowledge," *see Hogg*, 670 F.2d at 1362, actual knowledge may nonetheless be established circumstantially.

■ Gros next claims that there was insufficient proof of knowledge, required under Count II of the indictment, that the social security card was in fact stolen. It is of course true that the government may not here rely upon the familiar rule that the unexplained possession of recently stolen goods permits the inference of knowledge that they were stolen, *Barnes v. United States*, 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); *United States v. Johnson*, 741 F.2d 854 (6th Cir.1984) (per curiam). Indeed, as Gros points out, she was only fifteen years of age and living in another state when the card was stolen, and many years had since transpired. Nonetheless, she did possess both the social security card and the birth certificate of the person involved, and there was evidence that these documents were necessary to obtain an Ohio driver's license. There was ample proof that Gros used many different names and identities. There was also testimony that that card was in fact stolen. Viewed in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), retention of the card among other items of false identity was in our opinion fully adequate to support this element of Gros' conviction on Count II.

■ With reference to Count II, Gros also contends that there was no proof that

she in fact possessed the card since it was found covered with clothes in a locked suitcase in the bedroom which she jointly occupied with Levasseur. Again there was no error in the instruction of the court concerning constructive possession, and of course the document in question was a gender specific female identification document. This evidence, considered with evidence that she had quite systematically lived under assumed names, would be adequate to support the claim, and to permit a jury to infer beyond a reasonable doubt that she was in possession of the card.

Gros makes a vagueness argument with respect to Counts II, IV and V in asserting that the definition of "commonly accepted" was so vague and overbroad that it failed therefore to give defendant notice of the charges against her. This contention has been adequately rejected with respect to the same statute in *United States v. Quinteros*, 769 F.2d 968 (4th Cir.1985).

Defendant objects to the trial court's rejection of her requested charge that a finding of guilt may not be based on circumstantial evidence alone, but must be proved by circumstances consistent with the theory of guilt and also irreconcilable with any rational theory of innocence. This charge and others like it have been thoroughly discredited in this circuit in *United States v. Adamo*, 742 F.2d 927, 932 (6th Cir.1984), and cases cited therein.

Gros makes further objections to the admission of numerous items of evidence found during the search of her home, evidence which if relevant at all, was outweighed in probative value by the danger of unfair prejudice. These matters were primarily for the discretion of the trial judge and we find no error in their admission. Much of the evidence was highly probative of the contested issue of whether Gros was aware that Levasseur was a fugitive. The trial judge was very alert to uphold any objection to government efforts which he deemed overreaching and prejudicial.

Finally, Gros alleges that the warrant for the search of her residence was overly broad, failed to specify adequately the items to be seized, and did not identify those items which were connected with given crimes. In short, she alleges that the warrant was a general warrant, particularly to the extent that it permitted seizure of "books, documents and other papers tending to show motive and intent." While the description of the items sought to be seized was indeed broad, we are unable to find that it was so facially deficient in failing to particularize the place to be searched or the things to be seized as to require us to hold that the executing officers could not reasonably have presumed it to be valid. *See United States v. Leon*, 468 U.S. 897, 923, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984): "In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at 926, 104 S.Ct. at 3422. Viewed as a whole, the warrant was valid, and was relied upon in good faith by the officers.

Various other issues, such as the propriety of a subsequent instruction in response to a question from the jury, are raised either directly or peripherally, but we find all to be without merit. AFFIRMED.