UNITED STATES of America,
Plaintiff–Appellee,

v.

Jerry LOCKHART, Defendant–Appellant.

No. 91–1055.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 10, 1991.

Decided March 6, 1992.

Andrew B. Baker, Jr., Asst. U.S. Atty. (argued), Dyer, Ind., for plaintiff-appellee.

Fred W. Grady (argued), Grady, Terrell & Thrall, Valparaiso, Ind., for defendant-appellant.

Before BAUER, Chief Judge, CUDAHY, Circuit Judge, and WILL, Senior District Judge.[1]

BAUER, Chief Judge.

Defendant Jerry Lockhart was charged in a two-count indictment with conspiracy to harbor and conceal a federal fugitive in violation of 18 U.S.C. § 371 (1988), and with harboring and concealing a federal fugitive in violation of 18 U.S.C. § 1071 (1988). A jury convicted Lockhart on both counts, and he appeals. Lockhart contends that the evidence on both charges was insufficient to support his conviction. He also argues that newly discovered evidence and *Brady* violations require a new trial. Finally, he asserts that the government misrepresented the facts and evidence in its reply to his post-trial motion for acquittal or a new trial. Lockhart asserts that the trial court relied upon these misrepresentations when it denied the motion, and that we therefore should reverse the district court's denial. For the reasons given below we affirm.

I.

Because of Lockhart's allegations that the government misrepresented the record and that the district court did not properly review the record in ruling on his post-trial motions, we shall refer to the record in our recitation of controverted facts.

Lockhart is in the auto parts business. He and his wife operate Burr Street Auto Salvage in Gary, Indiana. Before they began the Burr Street business, they owned a business called Doors Unlimited, also in Gary, which specialized in selling used car doors. Lockhart participated in two-way auto parts traffic with southern parts dealers. He purchased rust-free doors from older southern cars, which are not as prone to rust as northern cars. He sold engines, transmissions, and other mechanical parts from northern cars to replace worn out parts in sound-bodied southern cars.

The federal fugitive, Dennis Mathews alias James Mills, worked for Lockhart in

---

1. The Honorable Hubert L. Will, Senior Judge of the United States District Court for the North-
ern District of Illinois, Eastern Division, is sitting by designation.

the parts business. Mathews was prosecuted for possession of a stolen, retagged motor vehicle in 1986. He failed to appear in court on November 21, 1986, and was charged with unlawful flight to avoid prosecution. The United States District Court for the Northern District of Illinois issued an arrest warrant on December 15, 1986. Mathews evaded arrest until May 1989.

The government's theory was that Lockhart harbored Mathews because he was receiving stolen car parts from Mathews. Trial Transcript (Tr.) at 402–03. Mathews was friendly with Norwood Fitzgerald, who, in a separate action, pleaded guilty to conspiring to steal cars and sell the parts. Tr. at 407. Fitzgerald testified that he was "close friends" with Lockhart and Mathews. Tr. at 434. While a fugitive, Mathews stayed in the auto parts business. During 1987 and 1988, Mathews continued to buy parts for Lockhart and Burr Street Auto from parts dealers in the South. Tr. at 177. For example, sales receipts from a parts dealer in Mississippi showed that Mathews purchased parts for Burr Street Auto in February and August of 1988. Tr. at 179–181.

Lockhart bought and sold parts from Dennis Worley in Arkansas. On or around December 1986, Lockhart and Mathews purchased a 1982 Oldsmobile Toronado from Worley. They asked Worley if they could mail the title to the car to him. Tr. at 196–98. The car was titled in the Mills alias, Tr. at 632, 705; presumably Mathews wanted to send the title to Worley to avoid giving the state motor vehicles office his own address. Worley could not remember which one had asked about the title, although he believed Mathews was Lockhart's agent, and assumed Mathews was acting on Lockhart's behalf. Tr. at 199, 204. Worley agreed to accept the title, but his wife returned it to the postman because she did not recognize the name on it. Tr. at 196–97.

David Seal, the owner of Jasper Auto Parts in Jasper, Alabama, testified that Mathews came to his shop with Fitzgerald three or four times in late 1987 to sell parts. Tr. at 339–340, 355. Fitzgerald delivered stolen parts to Mathews in Alabama in 1987. Tr. at 419. Fitzgerald said some stolen parts were sold under Mathews's direction to Jasper Auto Parts. Tr. at 420. Lockhart and Mathews also bought and sold parts together from Seal every few months during 1987 and 1988. Tr. at 335–337. During this time period, Seal assumed Mathews represented Lockhart's Burr Street business because Mathews continued to drive Lockhart's white Chevrolet truck and trailer. Tr. at 340.

Fitzgerald said he and Mathews made at least fourteen trips to Jasper to sell stolen parts during 1987 and 1988. Tr. at 421, 423. One of Seal's employees testified that Seal paid Lockhart $4,500 in cash for stolen parts delivered during 1987. Tr. at 493–95, 526–27. Seal concealed a 1982 Oldsmobile Toronado for Mathews at Jasper Auto Parts for several months during late 1987 and early 1988, presumably because Mathews knew the FBI had identified it. Tr. at 495, 515, 571, 682. This apparently is the Toronado Lockhart and Mathews purchased from Worley in December 1986. *See supra* at 1419–20.

In January 1988, Lockhart started a partnership with James Snow in an auto salvage business called J and J Auto Parts. J and J was located in Double Springs, Alabama. Inventory for J and J came from Burr Street Auto, and Mathews delivered several truckloads of Burr Street parts to J and J. Tr. at 244. Fitzgerald (the confessed car thief) said he and Mathews chopped up stolen cars at J and J Auto Parts during a two-week period in 1988. Tr. at 438–39. J and J stayed in business for a few months, but the Double Springs location was not profitable. While the business was still operating, Lockhart told Snow that Mathews would be living in a trailer in the J and J salvage yard. Tr. at 253, 257. (Another witness, Dennis Lane, testified that Lockhart also arranged for Mathews to stay in a trailer at David Seal's business, Jasper Auto Parts. Tr. at 567.) Lockhart told Snow that Mathews was being hunted by the law because of a "divorce or something." *Id.* Mathews only stayed in the trailer a few nights. Tr. at 257, 567.

Snow got a permanent job offer, and wanted to get out of the J and J partnership. Lockhart asked him to sign his interest over to Mathews. Snow agreed to sign it over to Mathews using the alias James Mills. Tr. at 247–248. The bank account was transferred to Mathews on May 21, 1988. Tr. at 250. Mathews a/k/a Mills designated Lockhart as the death beneficiary on the bank account. *Id.* When the J and J location failed, Lockhart rented a drive-in theater to convert to a salvage yard. Mathews was present when Lockhart negotiated the agreement with the owner of the drive-in, and made some of the $500 rent payments. Tr. at 222, 224.

Apparently when the trailer at J and J proved unsatisfactory, Mathews (using his alias) rented an apartment in Jasper, Alabama, in June 1988. Tr. at 121. Jasper is twenty-five miles south of Double Springs, where J and J was located. Mathews paid the first month's rent and deposit in cash. He made subsequent payments in cash or by money order. He stayed in the apartment until late August or early September of 1988. Witnesses saw a wrecker with a "J and J, Double Springs" sign on the door parked outside Mathews's apartment in Jasper. Tr. at 151. They also saw a trailer loaded with auto parts and a white, dual-wheeled pick-up truck parked at the apartment. Tr. at 153. Seal testified that these vehicles belonged to Lockhart. Tr. at 340.

Fitzgerald testified before a grand jury that he transported and sold stolen parts for Lockhart and Mathews. Tr. at 451. He told the FBI the same thing on eight different occasions. Tr. at 452. But at trial, he maintained that Lockhart may not have known the parts were stolen and that some parts he transported for Lockhart were not stolen. Tr. at 427–29. Fitzgerald was plagued at trial by memory lapses regarding his relationship with Lockhart. When pressed with a transcript of his prior grand jury testimony, Fitzgerald said he told the grand jury the truth about Mathews but that he said Lockhart's name because "it was a habit to say his name all the time." Tr. at 449–51. Finally, however, Fitzgerald conceded that he was telling the truth when he told the grand jury that Lockhart knowingly purchased and sold stolen parts. Tr. at 452–53, 454, 456.[2]

After Mathews left his apartment in Jasper, Alabama in September 1988, Special Agent Robert Becker noticed the pickup Mathews reportedly was driving in Gary, Indiana. Fitzgerald had informed Becker that Mathews was driving a red and beige pickup, and that he returned to Gary on weekends to see his family. Tr. at 641. Becker testified that he noticed Mathews's truck at his father's home in Gary at 7:00 a.m. on September 26, 1988. Mathews's father told Becker the truck belonged to one of Lockhart's employees, James Mills. (By this time the FBI knew Mathews was using the alias James Mills.) Tr. 647–48. Mathews's wife and father live only a few doors apart, and just a short distance from Burr Street Auto. When agents moved into the area, Lockhart drove into Mathews's wife's driveway and tried to enter her home. Tr. at 649–50. When Agent Becker questioned Lockhart, Lockhart said he was trying to find an employee whose father had taken ill. Tr. at 654–55. The agents were unable to locate Mathews on September 26.

They impounded the truck, which they discovered had been reported stolen in Kentucky the previous year, and retagged. Tr. at 661. Retagging means that the vehicle identification number plate is removed

---

2. Fitzgerald's precise testimony was:

Q. Do you remember telling the Grand Jury on that same occasion that you sold stolen parts to Jerry Lockhart and that he knew they were stolen?
A. I might have.
Q. Might have said that?
A. Yeah.
Q. Well, were you telling the truth about that or were you lying?
A. If I said it, I guess I said it.

Q. That's not my question. My question is when you said it, were you telling the truth or were you lying?
A. Telling the truth.

Tr. at 452–53. There was a similar exchange about Fitzgerald picking up stolen parts for Lockhart. *See* Tr. at 454. Fitzgerald did admit freely that he delivered stolen engines for Lockhart to a business called Andy's Tires. Tr. at 456.

from one vehicle and placed on another (usually stolen) one to disguise the second vehicle's identity. Tr. at 626. Inside Mathews's truck, the FBI found title and registration documents in the name of James Mills, Tr. at 661–62, as well as receipts for auto parts, some of them made out to Burr Street Auto. Tr. at 664.

Becker testified that on October 25, 1988, Lockhart approached the FBI through a Gary police officer to negotiate a possible surrender for Mathews. Tr. at 678. Lockhart told Becker that he knew Mathews had been a fugitive for the past two years, but that they remained in contact. Tr. at 679. Lockhart told Becker that Mathews was working for him, and Mathews was considering surrendering himself. Tr. at 680. Lockhart also told Becker that he had come to Mathews's wife's home on September 26, 1988, because Mathews was in the home, and Lockhart wanted to draw the FBI away. Tr. at 683. Becker testified that Lockhart said he helped Mathews get an Indiana drivers license in the name of James Mills. Tr. at 684. Lockhart also said he had given Mathews his own license to use. *Id.* The FBI does not negotiate surrender terms with fugitives, Tr. at 681, 688, and Mathews remained a fugitive until May 1989. Appellant's Br. at 27.

On October 31, 1988, Becker saw a Buick Riviera registered to Mathews's wife in Lockhart's driveway at 6:10 a.m. Tr. at 690. On November 23, 1988, Becker interviewed Mathews's father, Wilbur Mathews. Wilbur told Becker that the truck had been in his son's sole possession until the FBI seized it. Becker asked Wilbur how to contact Mathews. Wilbur said he contacted his son through Lockhart, and suggested that Becker do the same. Tr. at 692–93. Wilbur did not testify at trial. On January 30, 1990, (in the midst of the trial), he contacted the government and recanted his statements to Becker. Tr. at 614. The government informed the court and Lockhart's counsel of Wilbur's recantation on January 31, 1990. Tr. at 614–15. Because of his denials, the government did not call him as a witness. Tr. at 615. Neither did Lockhart.

Mathews did take the stand for the defense and testified that Lockhart did not know he was a fugitive, Tr. at 976, and did not associate with him in any way after 1986. Tr. 999, 1004. The court admitted telephone records from J and J and Burr Street Auto. These records showed calls to Norwood Fitzgerald, as well as to Mathews's relatives, were billed to Lockhart. Tr. at 716–17. Although the dates of the calls are not in the record, we assume they were made during the period that Mathews was a fugitive, or the court would have barred them on relevancy grounds. There were forty-six calls to Fitzgerald, one call to Mathews's brother, three calls to Wilbur Mathews, and forty-seven calls to Terry Millspaugh, a relative of Mathews's wife. Tr. at 716–18. One hundred twenty-four calls were placed from J and J to Burr Street Auto. Tr. at 718.

On April 12, 1989, the FBI seized a second car it believed belonged to Mathews at his brother's home. Tr. at 697–98. This car contained a renewed chauffeur's license in Lockhart's name dated September 29, 1988. Tr. at 701.

## II.

On appeal, Lockhart contends that there was insufficient evidence to support the jury's verdict that he conspired to harbor or conceal Mathews, knowing that a federal warrant had been issued for his arrest, and that he committed the substantive offense of harboring and concealing a federal fugitive. He charges that the government misrepresented facts in its response to his post-trial motion for acquittal. Lockhart also argues that newly discovered evidence and *Brady* violations require a new trial. We shall discuss each claim in turn.

In order to " 'prove that a defendant was a member of a conspiracy, the government must present sufficient evidence to demonstrate that the defendant knew of the conspiracy and that he intended to join and associate himself with its criminal purpose.' " *United States v. Morrison,* 946 F.2d 484, 491 (7th Cir.1991) (quoting *United States v. Auerbach,* 913 F.2d 407, 414–15 (7th Cir.1990). To prove

the second count—that Lockhart committed the substantive offense of concealing or harboring Mathews in violation of § 1071, the government had to establish three facts: that Lockhart knew that a federal warrant had been issued for Mathews's arrest; that Lockhart harbored or concealed Mathews; and, that Lockhart intended to prevent Mathews's discovery and arrest. *United States v. Udey,* 748 F.2d 1231, 1235–36 (8th Cir.1984), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3477, 87 L.Ed.2d 613 (1985) (citing *United States v. Hash,* 688 F.2d 49, 52 (8th Cir.1982)). *See also United States v. Silva,* 745 F.2d 840, 848 (4th Cir.1984), *cert. denied,* 470 U.S. 1031, 105 S.Ct. 1404, 84 L.Ed.2d 791 (1985). We must determine then, whether any rational trier of fact could have concluded that Lockhart is guilty of the crimes charged beyond a reasonable doubt. *United States v. Durrive,* 902 F.2d 1221, 1225 (7th Cir. 1990).

■■■ The first element of the substantive offense, knowledge of the warrant, may be proven by either direct evidence or inference. *United States v. Gros,* 824 F.2d 1487, 1496 (6th Cir.1987). *See also Silva,* 745 F.2d at 848; *United States v. Hogg,* 670 F.2d 1358 (4th Cir.1982); *United States v. Giampa,* 290 F.2d 83, 84 (2d Cir.1961). In this case, Lockhart told Agent Becker that he knew Mathews was a fugitive. Tr. at 679. Moreover, the jury could infer that Lockhart knew of the warrant based on evidence presented by the government: Lockhart attempted to draw the FBI away from Millspaugh's home; Lockhart arranged for Mathews to stay in a trailer at Jasper Auto Parts and at J and J; Lockhart helped Mathews establish and maintain an alias; and Lockhart met with the FBI to negotiate Mathews's surrender.

■■■ Some affirmative, physical action is required to "harbor or conceal" within the meaning of § 1071. "Failure to disclose a fugitive's location and giving financial assistance do not constitute harboring, but 'any physical act of providing assistance ... to aid the prisoner in avoiding detection and apprehension will make out a violation of section 1071.'" *United States*

*v. Stacey,* 896 F.2d 75, 77 (5th Cir.1990) (quoting *United States v. Yarbrough,* 852 F.2d 1522, 1543 (9th Cir.), *cert. denied,* 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988)). In *Stacey,* the defendant closed and locked the front door of the fugitive's house. *Id.* at 77. Because the defendant knew the officers looking for the fugitive were driving by, locking them out was a sufficient act to support her conviction. *Id.* Similarly, defendants who took a fugitive wounded by the FBI to a hotel in a different city, schemed to get him medical attention without attracting suspicion, and purchased a car under a false name to use as a getaway vehicle, "harbored or concealed" within the meaning of the statute. *Yarbrough,* 852 F.2d at 1543.

By contrast, conduct such as that considered in *United States v. Foy,* 416 F.2d 940 (7th Cir.1969), is not sufficient to support a conviction. In *Foy,* the FBI searched for a fugitive in an apartment where the defendant was present. The defendant told the FBI that he had not seen the fugitive since the day before. *Id.* at 941. The FBI discovered the fugitive hiding on a ledge outside a window. This court considered whether the failure to disclose a fugitive's location is the type of assistance contemplated by § 1071. *Id.* We held that harbor and conceal "must be construed narrowly, not to include all terms of assistance. 'These are active verbs, which have the fugitive as their object.'" *Id.* (quoting *United States v. Shapiro,* 113 F.2d 891, 892 (2d Cir.1940)).

Without further acts of concealment, a mere false statement does not violate the statute. The statute is intended to punish acts "calculated to obstruct the efforts of the authorities to effect arrest of the fugitive...." *Id. Foy* distinguished cases where the defendant commits affirmative acts to prevent the arrest of the fugitive. For example, in *Stamps v. United States,* 387 F.2d 993 (8th Cir.1967), the defendant barred officers from his apartment, removed the fugitive to a neighbor's apartment after the officers left, and picked up the fugitive and tried to drive away. *Id.* Similarly, a defendant who contacted police

to determine whether a fugitive was under surveillance, participated in a plan to test the surveillance, attempted to disguise the fugitive, and transported him in his car, properly was convicted of harboring and concealing under § 1071. *United States v. Faul*, 748 F.2d 1204 (8th Cir.1984), *cert. denied*, 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 632 (1985). *See also United States v. Arguelles*, 594 F.2d 109, 111 (5th Cir.), *cert. denied*, 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 81 (1979); *United States v. Jensen*, 561 F.2d 1297, 1300 (8th Cir.1977) (transporting a fugitive via speedboat down the Mississippi).

At trial, government witnesses outlined Lockhart's relationship with Mathews during the over two-year period in which Mathews was a fugitive. A review of that testimony supports the following facts: they remained business partners after Mathews became a fugitive; Lockhart helped obtain a car (the Toronado) for Mathews and let him use his own truck and trailer to transport parts, Tr. at 196–98, 151, 153, 340; Lockhart arranged for a driver's license with Mathews's alias, and gave him his own license as well; Lockhart set up the trailer in the J and J salvage yard, and told people Mathews was running from a bad marriage, Tr. at 253; Lockhart had his business partner (Snow) sign over a one-half interest in J and J Auto Parts to Mathews using the Mills alias, Tr. at 247–48; Lockhart decoyed the FBI away from Mathews's wife's house when he believed Mathews was in the house, Tr. at 649–50, 645–55, 683; and finally, he met with the FBI and attempted to arrange a surrender. These facts establish a more than sufficient basis for Lockhart's conviction on count one. Here we find far more affirmative action than a single trip in a speedboat (*Jensen*, 561 F.2d at 1300), or locking a single door (*Stacey*, 896 F.2d at 77). These facts evince a continuing commitment to shield Mathews from arrest.

■ We also believe the government has presented sufficient evidence to establish the third element of the offense, Lockhart's intent to prevent Mathews's discovery and arrest. We can conceive of no other explanation for Lockhart's behavior than that he intended to shield Mathews from arrest. Whether Lockhart was motivated by misguided friendship or his involvement in a stolen auto parts ring is irrelevant. He assisted Mathews in evading arrest.

■ These facts also prove that Lockhart joined a conspiracy to harbor Mathews. Mathews's wife and father were aware that Mathews was a fugitive, and both attempted to mislead investigating agents and to conceal Mathews's whereabouts. Tr. at 515, 570. Seal hid Mathews's Toronado in his salvage lot, and allowed him to park and live in a trailer at the lot. Tr. at 257, 267. Snow agreed to sign his interest in J and J over to Mathews using the alias, and to allow Mathews to stay in a trailer at J and J. Tr. at 253, 247–48.

Based on this evidence, the jury could infer that a conspiracy to conceal Mathews from the FBI existed. "[W]hen the sufficiency of the evidence to connect a particular defendant to a conspiracy is challenged on appeal, 'substantial evidence' should be the test...." *United States v. Kimmons*, 917 F.2d 1011, 1015 (7th Cir.1990). Here there was more than sufficient evidence that Lockhart was an active participant, if not the driving force, behind the conspiracy. He paid for telephone calls between the co-conspirators, initiated business and living arrangements for Mathews with Seal and Snow, and served as a contact between Mathews and his father.

■ We are troubled however, by the government's misrepresentations of the record in its response to Lockhart's post-trial motion for acquittal. *See* Government's Response to Defendant's Motion for Reconsideration of Denial of Judgment of Acquittal or in the Alternative a New Trial, Pleadings Vol. 3, Doc. No. 119 ("Response"). In its brief on appeal, the government concedes that there were inaccuracies in its response below. Appellee's Br. at 42. We have carefully reviewed the response and discovered at least thirteen mischaracterizations of the record. *See, e.g.*, Response, at 5, 8, 10, 11, 12, 13, 16, 17, 20. These inaccuracies range in signifi-

cance from mischaracterizations of testimony[3] to representations of fact that do not appear in the record at all.[4] We find these inaccuracies distasteful, regardless of whether they were caused by sloppy preparation or deliberate mischaracterization. We do not believe these inaccuracies taint Lockhart's conviction. Nevertheless, we feel compelled to remind the government that counsel are responsible for the veracity of the pleadings they submit. Forcing this court, as well as the trial judge, to plod through the record to check every representation of fact simply is unacceptable. The United States Attorney for the Northern District of Indiana is cautioned that any repetition of this conduct will not be tolerated.

## III.

Lockhart also alleges that *Brady* violations and newly discovered evidence require a new trial. We find both contentions to be without merit, and deserving of minimal discussion.

■ In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), the Court held that the prosecution may not suppress "evidence favorable to an accused ... where the evidence is material either to guilt or to punishment...." *See also United States v. Romo*, 914 F.2d

889, 898 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1078, 112 L.Ed.2d 1183 (1991). *Brady* requires that the defendant establish that the prosecutor knowingly suppressed material information favorable to the defense. *Id.* at 898. *See also United States v. Jackson*, 780 F.2d 1305, 1308 (7th Cir.1986). In cases where the prosecution is not using false testimony, the evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 1309–10 (citing *United States v. Bagley*, 473 U.S. 667, 684–86, 105 S.Ct. 3375, 3384–86, 87 L.Ed.2d 481 (1985)).

■ Lockhart contends that the government knowingly failed to reveal that one of its witnesses, Michael Lane, had a felony conviction for grand larceny. The district court found that the government did not know of the conviction, and thus did not violate *Brady*. District Court Order at 6, Pleadings Vol. 3, Doc. 123. Lockhart does not contest the factual finding on appeal. Therefore, as to Lane's felony conviction, Lockhart has failed to satisfy the requirements of *Brady*.

■ Lockhart also contends that the government's failure to provide him with the precise details of Wilbur Mathews's recantation violates *Brady*. On January

---

**3.** For example (the cites to the record are those provided by the government):

    Response at 20: Two of Seal's employees said they saw Lockhart and Mathews together delivering stolen parts.
    Record at 486: All testimony of employee 1 regarding Lockhart's delivery of stolen parts stricken after he admitted he didn't know if parts were stolen;
    Record at 547–48: Employee 2 saw Lockhart only once, and he was buying a part.
    Response at 17: Vaughn said Mathews and Lockhart bought the drive-in to use as a salvage lot.
    Record at 220–224: Vaughn said Lockhart bought it, but Mathews was present and made some payments for Lockhart. Government assertion to witness that Mathews and Lockhart were purchasing drive-in stricken as mischaracterization.
    Response at 16: Lockhart told Snow Mathews was on the run.

**4.** For example (the cites to the record are those provided by the government, however, we have have searched the entire record without success for these assertions):

    Response at 17: Fitzgerald said the drive-in location would be used as a chop shop and storehouse for stolen parts.
The government cites the Record at 436–439. There is no record of Fitzgerald making this statement.
    Response at 12: Fitzgerald said Lockhart placed orders for stolen parts with Fitzgerald.
The government cites the Record at 404–463. Again, despite the lengthy cite, there is no record of Fitzgerald making this statement.
    Response at 13: Lockhart admitted to Becker that he loaned an Oldsmobile to Mathews's wife so she could visit Mathews in Alabama.
    Record at 682: Lockhart paid $3,500 for a truck for Mathews, and confirmed that a 1982 Oldsmobile existed, but was now hidden.

Record at 253: Lockhart told Snow Mathews was running "from a divorce or something."

30, 1990, Wilbur recanted his statements to Agent Becker that he contacted his son through Lockhart. On January 31, 1990, the government informed the court and counsel of the recantation, and its decision not to call Wilbur. Lockhart made no attempt to call Wilbur to ask him about the statements or the recantation. We simply find no merit in the contention that the government was required to transcribe the recantation of a witness available to the defendant. Lockhart easily could have interviewed or called Wilbur as a witness, as he learned of the recantation before the government rested its case. As we stated in *Romo,* where counsel is on notice that a witness may have exculpatory information, and has an opportunity to subpoena that witness, there is no obligation for a prosecutor to seek out and provide information to a defendant. *Romo,* 914 F.2d at 899.

■ Lockhart also petitions for a new trial based on newly discovered evidence under Federal Rule of Criminal Procedure 33. To obtain a new trial on the basis of newly discovered evidence,

> a defendant must show that the evidence in question (1) came to the defendant's knowledge only after trial; (2) could not have been discovered sooner through the exercise of due diligence; (3) is material, and not merely cumulative; and (4) would probably lead to an acquittal in the event of a new trial.

*Jackson,* 780 F.2d at 1312 (quoting *United States v. Goodwin,* 770 F.2d 631, 639 (7th Cir.1985), *cert. denied,* 474 U.S. 1084, 106 S.Ct. 858, 88 L.Ed.2d 897 (1986)).

Lockhart offers the following "new evidence":

* Affidvait of Wilbur Mathews recanting statements made to Agent Becker.
* Affidavit of David Seal pinpointing dates of storage of Toronado, denying car was being hidden, and recanting other testimony.
* Affidavit of James Williams (another parts dealer) refuting testimony by government witnesses that he paid Lockhart $4,500 in cash for stolen parts.

* Handwriting analysis of driver's licenses in Mathews's alias, and the Lockhart license and applications in Mathews's possession. Analysis shows similarities between Mathews's writing and Lockhart signature on chauffeur's license.

Appellant's Br. at 66–76. Lockhart has failed to satisfy the requirements for newly discovered evidence. First, we see no reason why this evidence could not have been discovered earlier through the exercise of due diligence. *See Goodwin,* 770 F.2d at 639. Wilbur was available to testify at trial, and Lockhart was informed before he began presenting his case that Wilbur recanted his statement to Becker. Seal and Williams testified at trial. Lockhart could have brought out any facts contained in their affidavits during cross-examination, or he could have called them as his own witnesses. Finally, Lockhart knew that the driver's licenses Mathews used to maintain his alias would be elements in the government's case. He does not contend that he did not have an opportunity until after trial to have the documents examined by a handwriting expert. Without an explanation of his failure to produce any of this available evidence at trial, Lockhart's claim that the evidence requires a new trial must fail.

Further, even if this evidence could not have been found sooner through the exercise of due diligence, we would affirm the district court's denial of the motion for a new trial because we do not believe that this evidence would lead to an acquittal in the event of a new trial. *Id.* at 639–40. The affidavits merely deny wrongdoing on the part of the testifying witness. Certainly a jury could question the veracity of such self-interested denials, and choose to believe the government's version of the events. Further, the handwriting expert's testimony does not go to a pivotal issue in the case. Whether Lockhart signed the chauffeur's license application himself, or simply allowed Mathews to use his name, does not negate the substantial amount of other evidence implicating Lockhart in the conspiracy to harbor Mathews. Thus, we refuse to reverse the district court's denial

of Lockhart's motion for a new trial because Lockhart has failed to satisfy the requirements for newly discovered evidence.

### IV.

For the foregoing reasons, the opinion of the district court is

AFFIRMED.