**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 24 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MICHAEL HUDSON,

Defendant - Appellant.

No. 03-6282

(W.D. Oklahoma)

(D.C. No. 03-CR-96-R)

---

**ORDER AND JUDGMENT[*]**

---

Before **BRISCOE**, **ANDERSON**, and **LUCERO**, Circuit Judges.

---

Michael Hudson appeals his conviction following a jury trial on one count of

harboring a fugitive, in violation of 18 U.S.C. § 1071. We affirm.

**Background**

Pursuant to a felony arrest warrant[1] which was issued for Charlotte Popejoy in

December 2002, but was sealed until April 8, 2003, Deputy United States Marshal

Charles McNeil and other law enforcement authorities began searching for Popejoy in the

---

[*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

[1]The warrant was for being a felon in possession of a firearm, in violation of 18
U.S.C. § 922(g)(1).

Oklahoma City area. On that day, April 8, McNeil went to Popejoy's father's house and told her father, Bill Meredith, and brother, Bobby Meredith, that there was a warrant for her arrest. Bill Meredith said he would tell Popejoy about the warrant, and McNeil gave Bill Meredith his (McNeil's) pager and cell phone numbers.

On April 9, McNeil visited a friend of Popejoy's, who told McNeil she had just left with Ronnie Ek and Popejoy's son, Justin. The friend gave McNeil Popejoy's cell phone number. Shortly thereafter, Popejoy called McNeil and said her father had told her about the warrant. McNeil confirmed there was a warrant for her arrest, and Popejoy agreed to surrender at the Oklahoma County Jail at 3 p.m. that day. Popejoy failed to do so and did not answer her cell phone when McNeil attempted to contact her. Popejoy and her boyfriend, Glen Holder, testified that, instead of surrendering, Popejoy was picked up by Holder and they spent the night at a friend's house in Choctaw. Holder was aware of Popejoy's warrant both because she told him and because United States Marshals had visited Holder's grandmother the day before in an effort to locate Popejoy.

The following morning, April 10, Popejoy again called McNeil and promised to surrender. McNeil reiterated to her the existence of the warrant. Popejoy again failed to appear and surrender. That same day, shortly after the conversation between Popejoy and McNeil, McNeil learned through an informant that Popejoy was at an address in Oklahoma City and she was driving a black Ford Escort. Occupants at that address told McNeil that Popejoy had just left to find Dino Dibbler. Law enforcement personnel

2

searched for Dibbler, who was subsequently arrested when they found a firearm and a methamphetamine lab in his car. He told authorities that he had spent the day with Popejoy, but that he did not know where she went after she left. As it turned out, she and Holder went that evening to Del City. McNeil and others went to an address in Moore, Oklahoma, based on information that Ek might be there. They found Ek at the residence, as well as a methamphetamine lab, but were unable to locate Popejoy. Meanwhile, Holder had decided to cooperate with authorities.

On April 11, authorities spent the day searching for Popejoy at motels around the Oklahoma City area. That evening, Popejoy was with Holder when Holder was arrested by the Choctaw police for driving with a suspended license. Holder testified that he was trying to take Popejoy to a location where he could call the authorities and have her arrested. When the arresting officer ran a warrant check on Popejoy through the National Crime Information Center (NCIC), no warrants appeared and she was not arrested.[2] Popejoy testified that she spent that night, following Holder's arrest, with her niece in Norman, Oklahoma. Popejoy also testified that she called Hudson, whom she had known for six or seven years and with whom she had a sexual relationship for part of that time, late that night and told him that Holder had been arrested but she had not been, even though she had been told previously that there was a warrant out for her arrest. Sandra

---

[2]Because of a clerical error, Popejoy's warrant had not been entered into the NCIC database. Once McNeil realized this error had occurred, he took steps to ensure that Popejoy's warrant was entered into that database.

Goad, who lived in the same house as Hudson, testified that Hudson had not come home the night of April 11, and when he returned to the house the next morning, he told Goad that he had spent the night with Popejoy at a motel because she was a fugitive and federal authorities were looking for her.

Popejoy testified that she had not gotten together with Hudson until Saturday night, April 12, although she testified that she began borrowing his car, a black Ford Escort, perhaps as early as Friday, the 11th. Holder testified he saw her driving Hudson's car before he was arrested on the night of April 11. Popejoy testified that she spent Saturday night and/or Sunday night in Hudson's room in the house he shared with Goad and one other person. She drove Hudson to work on Saturday and Monday.

On Monday, April 14, authorities checked hotels during the day and Popejoy spoke again with Deputy McNeil, asking him why no warrant had appeared when her name was run through the NCIC database on Friday night. McNeil explained the clerical error, and he verified that there was, in fact, a warrant out for her arrest. That same day, after Holder had been released on bond, he rejoined Popejoy and they went to a motel, where they were joined in the evening by Hudson and Meredith. At one point, Popejoy and Meredith left the motel briefly and, while driving in Hudson's Ford Escort, Popejoy fell out of the car and injured herself. Hudson and Meredith helped bandage her injuries once she returned to the motel. Hudson and Meredith then had an altercation with Holder, accusing him of trying to help the authorities find Popejoy and threatening him if he did

4

so.[3]

The next day, April 15, Holder and Popejoy had a fight, so Holder dropped Popejoy at her mother's house. Popejoy testified that Hudson picked her up from her mother's house and took her to his house. In the evening of that day (April 15), Holder told McNeil that Popejoy was staying at Hudson's house. McNeil, accompanied by Holder and one of Holder's friends, drove to Hudson's house in McNeil's Jeep Cherokee, and began to conduct surveillance from a church parking lot approximately one block away. They saw two individuals, who turned out to be Meredith and Hudson, leave Hudson's house together in Hudson's black Ford Escort. McNeil testified that Popejoy told him that, before Meredith and Hudson left the house, she had told them "that she felt like the marshals were closing in on her and that they needed to get out of the residence so that they weren't there when she was arrested." ROA, Vol. 2 at 101. She then "stated that [Meredith and Hudson] left the bedroom and padlocked the door." Id. Popejoy's testimony at trial basically corroborated this.

Hudson and Meredith spotted the Jeep Cherokee parked in the church parking lot, which Hudson testified seemed suspicious. They therefore drove up close to the Jeep to let the occupants know they had been seen. McNeil testified that the encounter between the Jeep and the Escort seemed threatening, stating "I had my hand on my gun. I mean, I

---

[3]There was some confusion in the testimony of the various witnesses as to whether this incident at the motel happened Sunday night or Monday night.

thought we were fixing to have a shoot-out and I'm sure it seemed a lot longer than it . . . actually was." Id. at 205. McNeil also testified that Meredith had encountered McNeil once before when McNeil was driving the Jeep. McNeil stated that he could clearly see Meredith in the passenger seat. On the stand, he identified the driver as Hudson, whom he had not previously met.

McNeil called for backup and the Escort departed, although it did not return directly to Hudson's house. When McNeil appeared at Hudson's house after dropping Holder and his companion, Hudson and Meredith, who had circled back to Hudson's house in the Escort, were being placed in the back of cruisers by other officers. McNeil opened the back door of the police car in which Hudson had been placed and asked him if he knew where Popejoy was. McNeil testified that he responded that he "d[id]n't even know Charlotte Popejoy," id. at 207, while Hudson testified he stated that he did not know "where Charlotte's at." ROA, Vol. 3 at 352.

Officers then entered Hudson's house without a warrant and found Sandra Goad on the couch with another female. When asked where Popejoy was, Goad replied that she was not there and had already left. The agents forced entry into Hudson's locked bedroom and found Popejoy hiding in his closet under a pile of clothes. Officers obtained a state warrant to continue searching the house. They found a note on the bed in Hudson's bedroom on which was written "Federal charges, Charlotte Popejoy." Id. at 353.

6

Hudson testified in his defense, disagreeing with much of what other witnesses had stated. He denied knowing about the arrest warrant and, while he conceded that Popejoy had driven his car on occasion beginning on April 10, he essentially denied that she had spent very much time with him during the period she was evading arrest or that she stayed for any extended periods of time at his house. He also testified that, on the evening of her arrest, she had left his house before he and Meredith had the encounter with McNeil in his jeep, and he did not know how she ended up in his closet.

Following a jury trial, Hudson was convicted on one count of harboring a fugitive, in violation of 18 U.S.C. § 1071. He appeals, arguing (1) the evidence is insufficient to support his conviction; (2) his statement to McNeil concerning the whereabouts of Popejoy was made prior to his receipt of a <u>Miranda</u> warning and therefore violated his Fifth Amendment right against self-incrimination; (3) the warrantless search of Hudson's house and bedroom violated the Fourth Amendment and compels suppression of all evidence found pursuant to the search; and (4) evidence of other crimes was improperly admitted and severely prejudiced him.

### Sufficiency of the Evidence

18 U.S.C. § 1071 prohibits "harbor[ing] or conceal[ing] any person for whose arrest a warrant or process has been issued . . . so as to prevent his discovery and arrest, after notice or knowledge of the fact that a warrant or process has been issued for the apprehension of such person." It requires proof of four elements: "First, proof that a

7

federal warrant had been issued for the fugitive's arrest. Second, that the Appellant had knowledge that a warrant had been issued. . . . Third, that the Appellant actually harbored or concealed [the fugitive]. Finally, that Appellant intended to prevent [the fugitive's] discovery or arrest." United States v. Hill, 279 F.3d 731, 737-38 (9th Cir. 2002) (further quotation omitted). "The first element of the substantive offense, knowledge of the warrant, may be proven by either direct evidence or inference." United States v. Lockhart, 956 F.2d 1418, 1423 (7th Cir. 1992); see also United States v. Silva, 745 F.2d 840, 848 (4th Cir. 1984) ("[I]t is well established that the government may prove knowledge of a warrant by inference.").

"We review the record *de novo* when reviewing . . . the sufficiency of the evidence to support a conviction." United States v. Delgado-Uribe, 363 F.3d 1077, 1081 (10th Cir. 2004). We determine whether "viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." Id. (further quotation omitted). We do not evaluate the credibility of witnesses nor do we weigh conflicting evidence. Id.; see also Jackson v. Virginia, 443 U.S. 307, 319 (1979) ("This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.").

Hudson argues the evidence failed to prove beyond a reasonable doubt that (a) he knew that a warrant existed for Popejoy's arrest, and (b) even if he knew about the

8

existence of a warrant, that he intended to conceal Popejoy rather than assist her in preparing to surrender.

Hudson argues that, during the week period prior to her arrest, Popejoy spent time with various acquaintances at various locations, but she did not stay with, or spend substantial time with, Hudson. During that time, Hudson avers that, when Popejoy was with him, she never communicated to him that there was a warrant for her arrest.

We have carefully reviewed the record in this case, and conclude there was sufficient evidence from which a rational jury could find that Hudson was aware there was a federal arrest warrant for Popejoy. Deputy McNeil testified that Popejoy had told him a number of times "that she told Mr. Hudson that she was wanted as early as April the 9th." ROA, Vol. 2 at 99. Popejoy testified that she told Hudson on "the 12th through the 13th" that she was wanted by the government. Id. at 117. Goad's testimony corroborated that. Holder testified that, by the 14th, everyone knew there was a federal arrest warrant for Popejoy. While Hudson would have us find none of this testimony credible, it is well established that in reviewing the sufficiency of evidence supporting a jury verdict, we do not evaluate the credibility of witnesses nor reweigh the evidence.

We similarly conclude there was sufficient evidence supporting the jury's conclusion that Hudson's intent was to conceal Popejoy, not merely to assist her in turning herself in. Despite his awareness of the existence of the warrant, there was testimony that Hudson permitted Popejoy to stay for periods of time in his bedroom and

9

house.  He also permitted Popejoy to use his car on several occasions.[4]  There was also testimony that he threatened Holder when he thought Holder was helping police find Popejoy and that he assisted in treating Popejoy when she injured herself.  Finally, Popejoy testified that he locked her in his room when she determined, and communicated to Hudson, that she feared that authorities were closing in on her.  Bearing in mind that we may not reweigh the evidence or make our own assessment of witness credibility, we conclude there was sufficient evidence from which a jury could conclude that Hudson harbored Popejoy.

**Non-Mirandized Statement**

While Hudson was detained in the back of a police vehicle outside his house, Deputy McNeil asked him, without first reading him his Miranda rights, if he knew the whereabouts of Popejoy.  He responded he did not.  This statement was subsequently used against him in his trial for concealing and/or harboring Popejoy.

Prior to trial, the government moved for a Jackson v. Denno, 378 U.S. 368 (1964), hearing to determine the voluntariness of Hudson's non-Mirandized statement.  Hudson

---

[4]We note that "[§] 1071 does not proscribe all forms of aid to a fugitive."  United States v. Mitchell, 177 F.3d 236, 239 (4th Cir. 1999).  The harboring or concealing element of the statute "requires some 'affirmative, physical action' by the defendant," such as "a 'physical act of providing assistance, including food, shelter, and other assistance to aid the prisoner in avoiding detection and apprehension.'"  Id. (quoting Lockhart, 956 F.2d at 1423); see also Hill, 279 F.3d at 738 ("[A]ny physical act of providing assistance, including food, shelter, and other assistance to aid the [fugitive] in avoiding detection and apprehension will make out a violation of section 1071." (further quotation omitted)).

filed a motion to suppress the statement. The district court conducted a hearing and ruled

Hudson's statement was admissible:

> Well, I'm satisfied this qualifies for the safety exception to the Miranda rule. This is obviously a very volatile situation. Deputy McNeil had information that Ms. Popejoy had a weapon, suggested by her son. . . . [The fact that] the warrant [was] for a felon in possession of a weapon . . . even adds to the fact that that was a charge against her, and nighttime at this home, I think it was imperative they find out where she was and to diffuse a dangerous situation by finding it out as quickly as possible. So I do find it falls under that exception and I'll overrule the objection.

ROA, Vol. 2 at 56.

"In reviewing the district court's denial of a motion to suppress, we consider the evidence in a light most favorable to the government and accept the district court's factual findings unless they are clearly erroneous." United States v. Rambo, 365 F.3d 906, 909 (10th Cir. 2004). We review de novo conclusions of law. Id. "Determinations of witness credibility are subject to review under this standard." United States v. Cavely, 318 F.3d 987, 992 (10th Cir.), cert. denied, 123 S. Ct. 2653 (2003).

The government argues the district court correctly held that the public safety exception to Miranda, stated in New York v. Quarles, 467 U.S. 649, 655-56 (1984), applies to McNeil's question concerning the whereabouts of Popejoy. We need not decide whether the district court correctly applied the Quarles public safety exception to McNeil's question and Hudson's response, because we conclude that, even if the admission of the statement was erroneous under Miranda, its admission was harmless

11

beyond a reasonable doubt under Chapman v. California, 386 U.S. 18, 24 (1967). "The erroneous admission of evidence in violation of the Fifth Amendment's guarantee against self-incrimination . . . [is] subject to harmless-error analysis under our cases." Neder v. United States, 527 U.S. 1, 18 (1999) (citations omitted); see also Arizona v. Fulminante, 499 U.S. 279, 306-12 (1991) (applying harmless error analysis to confession coerced in violation of Fifth Amendment); United States v. Perdue, 8 F.3d 1455, 1469 (10th Cir. 1993) (applying harmless error analysis to admission of statement made in violation of Miranda); see also, e.g., Tankleff v. Senkowski, 135 F.3d 235, 245 (2d Cir. 1998) (applying harmless beyond a reasonable doubt standard to erroneous admission of inculpatory pre-Miranda statements).

"In conducting harmless error analysis, we review the record de novo." Perdue, 8 F.3d at 1469. Further, "[t]o hold an error of constitutional dimension harmless, we must conclude 'the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the [erroneously admitted statement] is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the [statement] was harmless error." United States v. Glass, 128 F.3d 1398, 1403 (10th Cir. 1997) (quoting Schneble v. Florida, 405 U.S. 427, 430 (1972)).

After carefully reviewing the record, we conclude there was ample other evidence, indeed overwhelming evidence, besides the statement to McNeil, supporting Hudson's conviction for harboring a fugitive. As we indicated in the context of our discussion of

12

Hudson's sufficiency of the evidence claim, there was testimony from several witnesses that Hudson knew of the existence of the warrant for Popejoy's arrest and provided her assistance in avoiding detection by letting her borrow his car on several occasions, letting her stay with him at his house for periods of time including at least one overnight visit, and threatening to harm Holder if he tried to turn her in. The fact that the jury heard that he denied knowing her whereabouts, or denied knowing who she was, immediately prior to her arrest in his locked bedroom[5] would have made very little difference in their assessment of the evidence. "In this case, we conclude that the 'minds of an average jury' would not have found the [prosecution's] case significantly less persuasive had the testimony as to [Hudson's statement to McNeil] been excluded." Schneble, 405 U.S. at 432; see also United States v. Sarracino, 340 F.3d 1148, 1164 (10th Cir. 2003). We are satisfied that the admission of Hudson's statement was harmless beyond a reasonable doubt.

**Warrantless Search of Hudson's Home**

Based upon information Holder had given authorities, the police reasonably believed that Popejoy was at Hudson's house. After receiving Hudson's response that he did not know Popejoy, or did not know where she was, McNeil talked to Meredith, who was also detained outside Hudson's house. After talking to Meredith, police officers

---

[5]As indicated, she testified that he locked her in his room when she perceived her apprehension might be imminent. The jury evidently discounted Hudson's testimony to the contrary.

13

approached the house. McNeil testified that the front door was partially open and he could see Goad and another woman in the living room. When officers entered the house and asked about Popejoy's whereabouts, Goad told them that Popejoy had left. When officers entered Hudson's locked bedroom, they found Popejoy hiding under some clothes in his closet. After arresting Popejoy, officers applied for and obtained a search warrant to seize "paperwork items, narcotic paraphernalia and narcotics." ROA, Vol. 3 at 252.

The government asserts that Hudson never challenged the warrantless entry into the house and search leading to Popejoy's arrest. Hudson does not claim that he raised this issue, nor does he indicate where in the record any objection appears. We therefore assume he has conceded that he failed to raise this issue in the district court, or to file any motion to suppress evidence obtained pursuant to the warrantless entry and search.

Hudson challenges the warrantless entry into the house and the search for the first time on appeal. As a result, we review the district court's failure to sua sponte suppress the fruits of the search under the plain error standard set forth in United States v. Olano, 507 U.S. 725, 731 (1993). See United States v. Lang, 364 F.3d 1210, 1216 n.3 (10th Cir. 2004); see also Fed. R. Crim. P. 52(b). Under the plain error standard, an appellant must clear several hurdles:

> [T]he error must (1) be an actual error that was forfeited; (2) be plain or obvious; and (3) affect substantial rights, in other words, in most cases the error must be prejudicial, i.e., it must have affected the outcome of the trial. . . . Given plain error that affects substantial rights, an appellate court

14

should exercise its discretion and notice such error where it either (a) results in the conviction of one actually innocent, or (b) seriously affects the fairness, integrity or public reputation of judicial proceedings.

United States v. Keeling, 235 F.3d 533, 538 (10th Cir. 2000) (internal quotation omitted).

Applying this standard to Hudson's Fourth Amendment claim, even if we assume an actual error was forfeited and that the error was "plain or obvious," the district court's failure to sua sponte suppress the fruits of the search did not affect Hudson's substantial rights. Specifically, we conclude, apart from the fact the police discovered Popejoy in Hudson's room, there was persuasive evidence presented at trial that over the course of a week, Hudson both harbored Popejoy and intended to conceal her from the police. Further, Hudson has not carried his burden to show that the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. See Olano, 507 U.S. at 736 (stating defendant, rather than Government, bears burden of persuasion with respect to third prong of plain error test); United States v. Moyer, 282 F.3d 1311, 1319 (10th Cir. 2002) (concluding imposition of illegal sentence constitutes plain error even if erroneous sentence benefits defendant); see also United States v. Prouty, 303 F.3d 1249 (11th Cir. 2002) (holding district court committed plain error in failing to allow defendant right to allocute at sentencing and sentencing him at high end of guidelines).

We reject the government's argument that exigent circumstances justified their warrantless entry. To support a claim of exigency, law enforcement officers must have reasonable grounds to believe there is immediate need to protect their lives or property, or

15

the lives or property of others; the search warrant must not be motivated by intent to arrest and seize evidence; and some reasonable basis approaching probable cause must exist to associate an emergency with the area or place to be searched. United States v. Smith, 797 F.2d 836, 840 (10th Cir. 1986). The burden is on the government to show exigency. Id. In assessing whether this burden has been met, the court evaluates the circumstances as they would have appeared to prudent, cautious, and trained officers. United States v. Scroger, 98 F.3d 1256, 1259 (10th Cir. 1996).

To prove exigency, the government relies upon the officers' belief that Popejoy was in Hudson's house, was armed, and might escape again, as she had eluded capture for a week. These facts do not support a finding that exigent circumstances justified a warrantless search of the residence. There was no emergency here. There was no basis for concluding that the officers had an immediate need to enter the house to protect life or property. There was also no basis to conclude that the officers had to enter a house to protect themselves and insure their safety. Instead, it would appear that, by entering the house, the officers only increased their potential for harm. More importantly, the warrantless entry appears to have been motivated purely by the officers' intent to arrest Popejoy.

### Other Crimes Evidence

Finally, Hudson argues the district court committed plain error in allowing the

16

admission of evidence of other crimes.[6]  Hudson argues the government gave no notice

that it intended to "introduce evidence that Hudson and others with whom Popejoy stayed

during the one-week period at issue were drug users, dealers and manufacturers.  Nor did

the government give notice of intent to insinuate Popejoy, Meredith, and by association,

Hudson, were associated with the 'Outlaw Motorcycle Gang.'"  Aplt. Br. at 33.

We agree with the government that Hudson fails to demonstrate any prejudice

stemming from the few references to the Outlaw Motorcycle Gang.  There was no

allegation that Hudson had committed any "other crime" in connection with the gang, and

the reference to it was primarily to explain why the warrant for Popejoy's arrest had been

issued in December 2002 but remained sealed until April 8, 2003.[7]

Hudson also alleges he suffered prejudice because the government elicited

testimony about illegal drugs and drug use by Hudson and others, and that such testimony

should have been excluded under Federal Rule of Evidence 404(b).  Hudson points to

three times during his trial when the government elicited such testimony.  At one point

there was brief testimony that two men with whom Popejoy had stayed were arrested

when methamphetamine labs were discovered in their home and car, respectively.

---

[6]Hudson concedes he failed to object to the admission of these "other crimes" at trial, and that our review is accordingly for plain error only.

[7]McNeil testified that there had been "an ongoing investigation into the Outlaws Motorcycle Club in the Oklahoma City area, and it was decided that even though some of the warrants came out earlier, we were going to attempt to serve all the fugitive warrants at the same time starting on April the 8th."  ROA, Vol. 2 at 76.  There was no warrant for Hudson at the time he was harboring Popejoy.

17

McNeil also testified that Hudson, Popejoy and Meredith were "drug associates," and there was testimony that Goad, who lived in the same house as Hudson, was a drug user and had last used drugs with Hudson on April 8th or 9th. This testimony prompted an admonition from the court to the jury that Hudson was not on trial for drug use.

> Rule 404(b) only applies to evidence of acts extrinsic to the charged crime. An uncharged act may not be extrinsic if it was part of the scheme for which a defendant is being prosecuted, or if it was inextricably intertwined with the charged crime such that a witness' testimony would have been confusing and incomplete without mention of the prior act.

United States v. Record, 873 F.2d 1363, 1372 n.5 (10th Cir. 1989) (citations and further quotation omitted). Intrinsic other act evidence is still excludable "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. The government argues that the evidence was inextricably intertwined with the crime for which Hudson was being prosecuted, and that it was necessary to provide a context for the actions of the various individuals involved.

We conclude that such testimony, even if erroneously admitted, did not prejudice Hudson so as to meet our plain error standard of review. There was ample evidence supporting his conviction for harboring Popejoy, and the court specifically reminded the jury that Hudson was not on trial for any drug-related activity. Further, while there was other testimony in this case concerning drug use, it was elicited by defense counsel, either to undermine the credibility of witnesses who were testifying or to minimize Hudson's culpability. In sum, we conclude there was no plain error in the admission of evidence of

other illegal conduct in this case.

## CONCLUSION

For the foregoing reasons, we AFFIRM Hudson's conviction.

ENTERED FOR THE COURT

Per Curiam

19

No. 03-6282; <u>United States v. Hudson</u>

**Anderson**, Circuit Judge, concurring:

I concur in the result in this case, and in all parts of the majority opinion, except the rationale for the majority's conclusion that the warrantless search of Hudson's house does not require suppression of the fruits of that search. The majority rejects the government's argument that exigent circumstances justified the warrantless search, and instead concludes that the failure to suppress the fruits of that search did not affect Hudson's substantial rights. I would hold that the district court's factual finding—that the situation facing officers at the time of the search was volatile and dangerous—is not clearly erroneous and supports the conclusion that exigent circumstances justified the warrantless search.

As the majority notes, Hudson failed to argue before the district court that the warrantless search was improper. Accordingly, the district court made no specific findings on the matter. The court did find, however, in connection with its analysis of the public safety exception to <u>Miranda</u>, that the situation facing officers at the time was "very volatile" and "dangerous." ROA, Vol. 2 at 56. The district court had also heard McNeil's testimony in the <u>Jackson v. Denno</u> hearing that, on a prior occasion when he attempted to arrest Meredith, he (Meredith), accompanied by Popejoy, attempted to evade police in a high-speed chase, following which they crashed and fled on foot. McNeil further testified at the hearing that he "believe[d] that Ms. Popejoy was on the property or in the house with a gun and there were at least six law enforcement officers standing in

the yard." Id. at 54.  Bearing in mind that the assessment of exigency requires an analysis

of how the circumstances would have appeared to prudent, cautious and trained officers,

United States v. Scroger, 98 F.3d 1256, 1259 (10th Cir. 1996), and further bearing in

mind that the district court evaluated the credibility of the testifying officers, I would hold

that the court's factual findings support the conclusion that exigent circumstances

justified the warrantless search.